UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 11-80106-Cr-MARRA

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

HAL MARK KREITMAN,

        Defendant.

_____/

**DEFENDANT'S SENTENCING MEMORANDUM AND RESPONSE TO**
**FIFTH ADDENDUM TO PRESENTENCE INVESTIGATION REPORT**

Defendant, Hal Kreitman, through counsel, respectfully submits his sentencing memorandum and response to the Fifth Addendum to the PSI [DE:1897-5].  Defendant further states:

**Introduction**

This memorandum sets forth grounds for imposition of a lower sentence on resentencing than the 8-year sentence originally imposed in October 2014.  In summary, those reasons are: (a) strong, positive post-sentencing rehabilitation by the defendant, including an exemplary record while incarcerated, educational and teaching achievements, and successful efforts to address the psychological and related personal factors that are essential to meaningful rehabilitation; (b) other personal factors, including the impact on the defendant's family of his continued imprisonment, with particular regard for his mother's declining health; and (c) case-related factors, including guideline calculation and variance issues that support imposition of a lower sentence.

The 96-month sentence previously imposed by the Court is 25 months below the low end of the guideline range that the Court found at the prior sentencing.  The Court found that defendant

Kreitman was in a "more mitigating position" than the two co-defendants who were tried with him, noting:

> He did not own the clinic.  He was not the nominee on the clinic.  He went to these clinics on a part-time basis.  His involvement was for a much [more] limited time period.

DE:1707:112-113.  Accordingly, this Court varied downward below the original 121-151 months range, imposing a 96-month sentence.  DE:1707:113.  The Court also ordered the defendant to pay restitution of $1,634,195.83, which was also the loss amount found by the Court.  DE:1707:113.

The guideline calculation was driven largely by the loss amount.  This Court calculated the loss on the basis of the parties' agreement that the total loss was to be derived from the insurance proceeds received by the clinics to which the defendant was assigned as a chiropractor by the staffing agency for which he worked.  *See* Fourth Addendum to PSI [DE:1897-4] ("the government concedes to one of the defendant's objections, which addresses the loss in this case [and] noted that the defendant's loss should be reduced to $2,333,172.15").

At the prior sentencing, the defendant argued that the $2,333,172.15 loss amount should be further reduced to reflect more precisely the time period when the defendant worked for the clinics and to link specific losses to the defendant's treatment of patients.  This Court agreed in part with the defense objection and ruled that defendant Kreitman's loss amount should be limited to losses that occurred during the period of time in which Kreitman was employed and being paid for work at the clinics.  DE:1707:4 (The Court:  "I am also finding that he should not be assessed any loss amount after he stopped, actually, working at the clinics in question ... ."); *id*. at 8–9 (this Court finds that the proceeds received by the entire criminal conspiracy during the period in which the defendant worked at the clinics was $1.6 million and that the defendant would be held "accountable for all of the loss" occasioned by the conspirators in that period of time).

Defendant Kreitman submits that on remand from the Eleventh Circuit, the parties and the Court are called upon to determine, from the previously-stipulated losses that the parties addressed and the Court found at the original sentencing, what losses should be attributed to defendant Kreitman.  *See United States v. Ramirez*, No. 14-14689, 2018 WL 651454, at *10 (11th Cir. Jan. 31, 2018).  The Eleventh Circuit explained that a defendant is responsible only for acts and omissions of others that were "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity."  *Id*. (citing U.S.S.G. § 1B1.3(a)(1)(B)).  The Eleventh Circuit held that these principles require individualized findings concerning the scope of criminal activity undertaken by the defendant.  *Id*.

The Eleventh Circuit noted that the "jointly undertaken criminal activity can be narrower than the scope of the entire conspiracy."  *Id*. (citing U.S.S.G. § 1B1.3, cmt. n. 2).   Thus, a restitution amount can be greater than a loss calculation in this context, because loss calculations are limited to reasonably foreseeable acts taken in furtherance of jointly undertaken criminal activity, while restitution can encompass reasonable foreseeable losses apart from the limitation of jointly undertaken conduct.  *Id*. In this case, however, according to the Fifth Addendum to the PSI, DE:1897-5, the government proposes a restitution (paid insurance claims) amount of $795,945.51, but a loss amount ($1,539,368.53) that nearly doubles the restitution figure.  In so doing, the government proposes to withdraw from the loss theory and methodology on which the parties jointly proceeded at the original sentencing.  The defendant disputes the government's submission of a changed theory of loss at this stage of the case and proposes maintaining the original sentencing focus on paid insurance claims.  Applying the analytical standard noted by the Eleventh Circuit to

the actual losses identified in the original sentencing yields a loss estimate not greater than $550,000, i.e., approximately 30% below the restitution figure submitted by the government.

This memorandum addresses loss calculations premised on both the original sentencing stipulation, on which the parties and the Court relied, and the new, contrary theories offered by the government. Under either approach, however, and considering relevant factors at resentencing, *see Pepper v. United States*, 562 U.S. 476, 507 (2011); *United States v. Stinson*, 97 F.3d 466, 469 (11th Cir 1996), the defendant requests that the Court find that the guideline range should not be greater than 63–78 months and that a downward variance is warranted.

> **Mr. Kreitman renews his requests for a downward sentencing variance, including a variance based on post-sentencing rehabilitation and other grounds.**

In *Pepper v. United States*, the Supreme Court held that when a defendant's sentence has been set aside on appeal, a district court at resentencing may consider evidence of the defendant's post-sentencing rehabilitation as a basis for a varying downward from the advisory Guideline range. 562 U.S. 476.  *Pepper* reasoned that, post-sentencing, a defendant can be a different person from the one the district court originally sentenced, years earlier.  562 U.S. at 492.  Further, a defendant's constructive post-sentencing conduct also indicates a reduced "likelihood that he will engage in future criminal conduct, a *central factor* that district courts must assess when imposing sentence." *Id*. (emphasis added).[1]

In compliance with this Court's Order (DE:1677), Mr. Kreitman self-surrendered to the Bureau of Prisons on January 5, 2015, and began to serve his sentence; he remains incarcerated.  At

---

[1]  *See United States v. Harkness*, 481 Fed.Appx. 558, 560 (11th Cir. 2012) (unpublished) (remanding to district court for an opportunity to consider defendant's post-sentence rehabilitative conduct under *Pepper*); *United States v. Harris*, 429 Fed.Appx. 816 (11th Cir. 2011) (same).

Mr. Kreitman's sentencing, defense counsel noted that after his arrest in this case Mr. Kreitman led an "exemplary life." DE:1707:49. While on bond, Mr. Kreitman successfully completed the required Compass Health Systems program. PSI ¶ 119. He tested negative for illicit substances. PSI ¶ 118. His overall health was "excellent." PSI ¶ 114. Notably, on appeal, the Eleventh Circuit addressed the pre-arrest interactions with FBI agents and explained that Mr. Kreitman, on his own initiative, "told them about his involvement in the clinics." *Ramirez*, 2018 WL 651454, at * 8.

During his more than three years of imprisonment, Mr. Kreitman has not incurred any disciplinary sanctions. And he has completed numerous courses, and taught courses, showing his dedication to being a better person. He completed programs he was by no means required to complete, including therapeutic programs addressing substance abuse and psychological counseling. Mr. Kreitman enrolled in correspondence courses offered by The Aleph Institute. The Aleph Institute provides prison inmates with courses in religious education designed to rehabilitate offenders, and to facilitate their successful reintegration into civil society. *See* Brief Amicus Curia of Prison Fellowship Ministries and the Aleph Institute in Support of Respondents in *City of Boerne v. Flores*, 1997 WL 10274, at *1-2 (Jan. 10, 1997) (Bureau of Prisons describes the Aleph Institute as "the most significant rehabilitative program for Jewish prisoners in the history of the U.S. prison system"). By teaching, studying, engaging in counseling, going through intensive programs regarding substance abuse issues (without any form of sentence reduction credit), and by maintaining a record of commitment to improvement and rehabilitation, defendant Kreitman has conducted himself in exactly the manner of one who has accepted responsibility for his own actions and is taking every positive step to correct and improve. Kreitman 's post-sentencing rehabilitation makes it appropriate for this Court now to vary downward, below the advisory Guideline range. The

equivalent of a 2–3 level offense level reduction would be appropriate based on the excellent rehabilitative efforts of the defendant that were not incorporated into his original guideline range.

In addition, Mr. Kreitman has sought to continue to be a positive influence in the lives of his family and friends.  The letters submitted by family and friends show that he has demonstrated to them his positive, forward-looking approach and helped their lives by his own conduct and attitude. The circumstances faced by the defendant at this time include his mother's serious illness and her need for daily dialysis that should be considered when evaluating whether a downward variance based on present circumstances is warranted.  Although Kreitman can no longer engage in health care practice, his focus on health would be of great assistance to his mother at this time.

In addition, the same factors that warranted the original variance apply at resentencing.  As the Eleventh Circuit noted, Kreitman volunteered statements that led to his conviction, and thus likely contributed generally to the government's case at trial.  His involvement was temporally limited and premised on the non-heartland situation of a temp worker placed into an environment of a fraudulent business—a circumstance that is brought into further focus by the defendant's receipt of temp-level wages paid by a staffing company. The same reasons that justified this Court's prior downward variance continue to apply at resentencing.   These factors and other guideline considerations addressed below support a downward variance.

> **Calculations of the loss amount, and of the number of victims, based on individualized findings concerning the scope of Mr. Kreitman's criminal activity.**

The actual loss figures submitted by the government to the probation office for this resentencing amount to less than $800,000 for all patients for which interactions with defendant Kreitman was seen.  But while that figure should cap the maximum potential loss associated with the defendant, it is not accurate to equate all of those losses with knowing wrongful conduct by the

6

defendant, for a number of reasons.  First, the jury was not asked to determine whether defendant Kreitman had committed acts of fraud until late August 2010 at the earliest.  Losses occurring from May to August 2010 are not reliably attributed to the defendant for sentencing purposes.  Second, even as to billings after August 2010 and before Kreitman complained and broke with the clinics, it is unclear that all of those billings were attributable to Kreitman, that he knew that all of those patients were feigning injuries, or that there were no actual injured patients.  In fact, the testimony by government witnesses at trial indicated that some patients were injured and some treatments were reasonably provided. And the billing for some of the patients at issue is inconsistent with fraud scheme of billing for car accidents.

Given the Court's prior ruling as to the cut-of date for billing losses, as well as the speculative components of the government's estimation proposal, a more reasonable estimate of the amount attributable to the defendant would be between $350,000 and $550,000, thus granting approximately a 30% reduction in the loss figure.  That figure, which still assumes fraud as to patients for which the evidence is unclear, would avoid the risk of unduly attributing loss beyond the requirements of the sentencing guidelines, and would not impugn the jury finding of the defendant's knowledge of wrongdoing approximately four months into his work at the clinics.[2]

As the Eleventh Circuit noted in its decision, under the 'jointly undertaken criminal activity' provision, three criteria must be satisfied to impose liability on a defendant.  The three-step analysis requires that the sentencing court (1) identity the scope of the jointly undertaken criminal activity; (2) determine whether the conduct of others in the jointly undertaken criminal activity was in

---

[2] At the original sentencing, the defense argued the loss amount was $320,000 and requested the same 12-level loss enhancement that the defense seeks in this memorandum.  DE:1707:9.

furtherance of that criminal activity; and (3) determine whether the conduct of others was reasonably foreseeable in connection with that criminal activity. *Ramirez*, 2018 WL 651454, at *10.

"[F]or sentencing purposes the scope of each defendant's jointly undertaken criminal activity depends on 'the scope of the specific conduct and objectives *embraced by the defendant's agreement*.'" *United States v. Barona-Bravo*, 685 Fed.Appx. 761, 781 (11th Cir. 2017) (quoting § U.S.S.G. § 1B1.3, cmt. n. 3(B) (2015)) (emphasis added in *Barona-Bravo*). "Therefore, 'acts of others *that were not within the scope of the defendant's agreement*, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct." *Barona-Bravo*, 685 Fed. Appx. at 781 (quoting § 1B1.3, cmt. n. 3(B)) (emphasis added in *Barona-Bravo*).

"Further, a defendant's relevant conduct does not include conduct of members of a conspiracy prior to the defendant's joining of the conspiracy, even if the defendant knows of that conduct." *Id.* In *Barona-Bravo*, the court reversed for determination of "the scope of criminal activity each particular defendant agreed to jointly undertake." *Id.*; *see Ramirez*, 2016 WL 651454 at * 2 (noting that Mr. Kreitman was not a straw owner, but an "independent contractor").

Finally, it bears noting that the same test applies to the determination of the number of victims. *See United States v. Blanc*, 660 Fed. Appx. 882, 884– 84 (11th Cir. 2016) (determination of number of victims is part of the defendant's "relevant conduct"). The government's estimate of more than 10 victims remains speculative, and a more reliable estimate, and one consistent with the indicted conduct, would be less that 10 victim insurance companies as to the defendant's knowing wrongful conduct. The loss adjustments proposed by the defendant would yield a 12-level enhancement for loss amount (4 levels below the 16 levels sought by the government), and would remove the 2-level enhancement for the number of insurance company victims.

**The circumstances of defendant's money laundering convictions are outside the heartland of the laundering guideline, and because Chapter 3 adjustments are based on the money laundering conduct, a downward adjustment is warranted.**

At sentencing, the Court can address—either by correction of the guideline error or by imposing an additional downward variance—whether the revised calculation's use of the money laundering guideline, rather than the fraud guidelines, to determine the defendant's sentence is warranted.  The Court should employ the fraud guideline, U.S.S.G. § 2B1.1, and not the money laundering guideline, U.S.S.G. § 2S1.1, because the fraud guidelines would yield a higher guideline range than the money laundering guideline.  This is so because of the unique application of application of Chapter Three adjustments to the money laundering guidelines.  When a defendant is sentenced under the money laundering guidelines, Chapter Three adjustments must be premised solely on the money laundering conduct, not the underlying fraud or other conduct.  *United States v. Salgado*, 745 F.3d 1135, 1138–39 (11th Cir. 2014).   And thus in the context of this case, the special skill enhancement under U.S.S.G. § 3B1.3, which relates solely to the fraud conduct and not to the money laundering conduct, can be sustained only if the fraud guideline is applied.

The money laundering guideline requires that the offense underlying the money laundering (in this case, the fraud offense) is used to calculate the base offense level. *See* U.S.S.G. § 2S1.1(a)(1).  However, when making Chapter Three adjustments to the base offense level for specific offense characteristics, the guideline commentary instructs that the court should look to the defendant's conduct in the *money laundering offense*, and not the conduct in the underlying offense. *See id.* § 2S1.1(a)(1), comment. (n. 2(C) ).

In *Salgado*, the Eleventh Circuit enforced as binding this guideline commentary where the sentencing court, applying the money laundering guideline, had  relied upon the underlying drug offense, and not the money laundering conduct itself, for determining Chapter Three adjustments.

9

*See id.* at 1136–38, 1140. Thus, the sentencing court failed to properly apply and calculate the Guidelines, and the Eleventh Circuit vacated *Salgado*'s sentence and remanded to the district court to recalculate the advisory sentencing range. *See id.* at 1138–40. Specifically, Application Note 2(C) provides: "(C) Application of Chapter Three Adjustments.–Notwithstanding § 1B1.5(c), in cases in which subsection (a)(1) applies, application of any Chapter Three adjustment shall be determined based on the offense covered by this guideline (i.e., the laundering of criminally derived funds) and not on the underlying offense from which the laundered funds were derived."

For this reason, in order to properly count the Chapter Three enhancement for use of a special skill, the Court should use the fraud guideline, not the money laundering guideline, to calculate the defendant's guideline range. *See* U.S.S.G. § 3D1.3(b).

An equally important reason for applying the fraud guideline, rather than the money laundering guideline, is that in light of the Eleventh Circuit's basis for affirmance of the money laundering convictions, it is clear that if the defendant were sentenced under the money laundering guideline, he could receive a minor or minimal role reduction under U.S.S.G. § 3B1.2 *as to the money laundering conduct* (which as to this defendant amounted to receiving two checks of a few hundred dollars). But if he is sentenced under the fraud guideline, the defendant would not be eligible for a laundering role reduction, no matter how limited his role in such conduct was. Consequently, even though eligible for a role reduction if the money laundering guideline were used to set the guideline range, applicability of such a reduction means only that the defendant's guideline sentence should be set based on the *higher* fraud guidelines *without* a role reduction.

In other words, because the defendant played only a minimal role in any money laundering, his money laundering-based guidelines would be lower than his fraud-based guidelines, and therefore his sentence should be based on the fraud guidelines. No special offense enhancement for

10

money laundering under U.S.S.G. § 2S1.1 would therefore apply.  The correct resulting guideline, determined under U.S.S.G. § 2B1.1, is lower than the level of 31 set forth in the Fifth Addendum to the PSI.  Applying the fraud guidelines, with a loss under $550,000, produces: a base offense level of 7 levels; loss enhancement (+12 levels); special skill (+2 levels); and sophisticated means (+2 levels) = level 23.  The offense level increases to 25 if more than 10 victims are found.  At level 23, the defendant's guideline range is 51–63 months.  At level 25, the guideline range is 63–78 months.

Even if the Court does not apply the fraud guideline range, and alternatively considers the overstatement of the guideline range merely as a variance factor, the resulting sentence still should not exceed that of the corrected guideline range.

### Restitution for losses proportionate to the extent of Mr. Kreitman's causal role in the scheme.

"Generally, a district court may impose restitution only for losses caused by the conduct underlying the offense of conviction." *United States v. Anthony*, 683 Fed. Appx. 757, 761 (11th Cir. 2017).  When a defendant has been convicted of conspiracy, as here, *see* DE:1161:17-19; DE:1381:1, a district court "may impose restitution for all losses caused by the defendant's conduct in the course of a scheme."  *Id.* (citing *United States v. Foley*, 508 F.3d 627, 636 (11th Cir. 2007).

However, restitution must remain proportionate to the "role of the offender in the causal process underlying the victim's losses and suited to the relative size of that causal role." *Paroline v. United States*, __U.S. __, 134 S.Ct. 1710 (2014).  *Paroline* involved restitution to a victim of child pornography, but its broad principles are applicable in other contexts, such as access device fraud, *United States v. Marunda*, 2018 WL 19404408 at * 5 (5th Cir. 2018), securities fraud, *see United States v. Shabudin*, 701 Fed. Appx. 599, 602-03 (9th Cir. 2017), or, as here, mail fraud, *see Schwartz v. Commission of Internal Revenue*, 2017 WL 5125662 at * 12 (6th Cir. 2017).

At Mr. Kreitman's original sentencing, this Court stated that Mr. Kreitman was in a "more mitigating position" than the two co-defendants who were being sentenced with him. DE:1707:112-113.  Thus, the relative size of Mr. Kreitman's causal role in victim losses was less than the principal conspirators.  *See id*.  Therefore, the amount of restitution this Court now orders Mr. Kreitman to pay should reflect Mr. Kreitman's relatively lesser causal role.  *See United States v. Barry*, 647 Fed. Appx. 519, 524 (6th Cir. 2016) ("*Paroline* instructs district courts to 'order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses.'") (quoting *Paroline*, 134 S.Ct. at 1727); *Ramirez*, 2016 WL 651454 at * 10 (authorizing this Court to reconsider the restitution amount in light of its reconsideration of the loss amount).

**WHEREFORE**, Mr. Kreitman respectfully requests that this Court recalculate the guideline levels and restitution amount as discussed above.  In addition, Mr. Kreitman requests that this Court vary downward below the Guideline range.

Respectfully submitted,

s/ Richard C. Klugh
Richard C. Klugh, Esq.
Florida Bar No. 305294
Ingraham Building
25 S.E. 2nd Avenue, Suite 1100
Miami, Florida  33131
Tel. 305-536-1191
Fax 305-536-2170

### CERTIFICATE OF SERVICE

I HEREBY certify that on   June 18, 2018   , I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

s/ Richard C. Klugh
Richard C. Klugh, Esq.